## CHAPLA JACK v. STATE.

No. A—3348.  Opinion Filed April 5, 1920.

(188 Pac. 684.)

(Syllabus.)

1. **HOMICIDE—Murder—Sufficiency of Evidence.**  In a prosecution for murder, the evidence reviewed, and **held** sufficient to sustain the conviction. with imprisonment for life as the punishment.

2. **APPEAL AND ERROR—Absence of Briefs—Review of Murder Case.**  In a homicide case, where the defendant appeals from

a judgment of conviction for murder, and no briefs are filed or argument presented. this court will carefully examine the record and all questions involved therein, and, if no error is apparent, the judgment will be affirmed.

*Appeal from District Court, Hughes County;*
*Geo. C. Crump, Judge.*

Chapla Jack was convicted of murder, and he appeals. Affirmed.

*J. L. Skinner,* for plaintiff in error.

*W. C. Hall,* Asst. Atty. Gen., for the State.

DOYLE, P. J.    Plaintiff in error, Chapla Jack, herein referred to as defendant, was convicted of the murder of his wife, and in pursuance of the verdict of the jury was sentenced to imprisonment in the penitentiary for life at hard labor.    He has appealed from the judgment to this court, but there has been no appearance in his behalf on his appeal.

It appears that the parties concerned and the principal witnesses are Creek Indians.    The testimony tends to prove a most heartless and brutal murder.

The defendant, his wife, and her son, Sumsie Yargee, left Wetumka together some time before midnight on the date alleged to drive to their home, and the killing occurred within two miles of their home.    Mattie Jack was shot twice with a 38-calibre pistol.    One bullet entered the right hip, the other bullet entered to the left of the spine, and both passed through her body.

Sumsie Yargee testified:

"I am 14 years old.    Mattie Jack is my mother; Chapla Jack is my stepfather. About 10 o'clock that night

we left Wetumka in a buggy. I fell asleep, and woke up hearing Chapla Jack cursing my mother. I heard him say, 'I will kill you,' and he shot her twice with a pistol; then jumped out of the buggy and ran off. I jumped out of the buggy and ran home, which was not quite two miles from where the shooting occurred."

Nanie Lucas testified:

"I know Chapla Jack and his wife, Mattie Jack. I have known them I might say nigh all my life; Chapla and I were boys together; I lived right by them 13 or 14 years. They telephoned for me to come down there; I got there about 1 o'clock. Mattie Jack was dead. I examined the wounds. One shot was in the hip; the other shot entered a little to the left of the back bone. I speak the Creek language; I asked Chapla Jack how this happened. He told me they were driving home that night and a fellow was standing in the road about as far from here to the wall back there at the time he saw him, and the fellow shot at him. He said when the first shot fired he fell out of the buggy, and he got up, and Mattie asked him if he was shot. He said, 'No,' and she said, 'I am; I am going to die.' He said both shots were fired from the front. He said he was riding on the right-hand side of the buggy, and she was doing the driving. I examined the buggy, the top was down, and a bullet hit the top from the left-hand side and ranged down and went through the back of the seat and lodged in the front of the seat on the right-hand side. This is the only shot that hit the buggy."

Mitchell Compier testified:

"I am a full-blood Creek Indian. I have been deputy sheriff in Hughes county since statehood. I know Chapla Jack, and I knew Mattie Jack in her lifetime. I was at their place the next day after the killing, and talked with the defendant. He said somebody had been

waiting on the road between his house and Wetumka, and they shot at him and shot his wife."

.The defendant, as witness in his own behalf, testified:

"My age is 35 years. I am a full-blood Creek. I and Mattie have been married over 10 years. On that day I went to Okmulgee, and my wife went with me. We got back to Wetumka about 6 o'clock, and after 10 o'clock we started for home in the buggy. I started to drive, and my wife suggested that she drive; she was driving at the time she was shot. The boy was in the back of the buggy asleep; he went to sleep just as we crossed Wewoka creek; two miles from there a fellow rode up on horseback and clicked his gun, and I jumped out and he fired two shots. My wife said, 'I am shot.' I went to the buggy and felt for the boy, and he was gone. It was a prairie spot near the road where the shooting occurred. I could not say who it was that did the shooting. I believe that it might have been Canuky Harjo, because he said he was going to kill me, and I saw him in Wetumka that night. I started home with her in the buggy and went on a piece, then I decided to get my brother-in-law, John Talamajesse, to help me. His place was about a mile away. We went back to the buggy and took her down to the house; Sumsie opened the door. I did not shoot my wife."

On cross-examination he was asked:

"Q. You made a complete statement to the officers about this when they came over to your house to investigate the killing, didn't you, long before you were arrested? A. Yes, sir.

"Q. Didn't you say that the man just rode up and shot two shots directly in front of you, and didn't you show Mr. Turner, Nanie Lucas, and Mitchell Compier just where you stood and where you were when you fell out of the buggy, and where the man was that done the shooting; didn't you do that? A. Yes, sir; I told them that.

"Q. Was that true? A. No, sir; it was not.

"Q. You could see this man prety plain, couldn't you, that done the shooting. A. Yes, sir.

"Q. Was he an Indian? A. It was dark; I could not tell whether he was an Indian, white man, or negro."

John Talamajesse testified:

"I live five miles east of Wetumka. Chapla Jack is my brother-in-law. I heard two shots fired that night. Chapla Jack came to my house, and I went with him and found the dead woman in the buggy hardly half a mile from my gate. Chapla Jack said, 'Let's take her down to my house,' and we took her there. Sumsie and the other boy, Seneta, were there."

Three or four witnesses testified that the general reputation of the defendant in that community was that of being an upright and law-abiding citizen.

It appears from the record that no exceptions were taken on the trial to rulings of the court, and no exceptions were taken to the instructions given by the court to the jury, and no instructions were requested to be given by counsel for defendant. The instructions covered every question of law suggested by the facts in evidence, and were as favorable to the defendant as he could ask or demand.

We have given careful examination and consideration to the record in this case, and no error whatever appears therein, and on reading of the evidence the conclusion seems beyond reasonable doubt that the verdict reached was the only one which the jury would have been justified in rendering. Accordingly the judgment should be, and is, affirmed.

ARMSTRONG and MATSON, JJ., concur.